## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | | |
|---|---|---|
| RHONDA JACKSON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:22-CV-207 (LAG) |
| | : | |
| SUMTER COUNTY, GEORGIA, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

Before the Court Defendant's Motion for Summary Judgment. (Doc. 19). For the reasons below, Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED**.

## BACKGROUND

Plaintiff William Jackson (Plaintiff) brings this case against Defendant Sumter County (Defendant) for actions arising out of his late wife Rhonda Jackson's (Jackson) employment with the Sumter County Board of Commissioners (Board). [1] (*See* Doc. 9 ¶¶ 1, 7; Doc. 19-1 ¶ 1; Doc. 24-1 ¶ 1). Defendant Sumter County hired Rhonda Jackson on March 11, 2014, as the administrative assistant for the Sumter County Board of Commissioners. (Doc. 19-1 ¶ 1; Doc. 24-1 ¶ 1).[2] Jackson's direct supervisor during the relevant period was the county administrator, Rayetta Volley. (Doc. 19-1 ¶¶ 10–11; Doc. 24-1 ¶¶ 10–11). Defendant dismissed Jackson from her employment on April 26, 2022. (Doc. 19-1 ¶ 5; Doc. 24-1 ¶ 5). According to Defendant, it fired her for violating Section 21 of the Sumter County Policies and Procedures (the Policy) which prohibits harassment, after it received

---

[1]     Rhonda Jackson was the Plaintiff to this action, but she passed away on June 5, 2024. (Doc. 31). The Court granted Rhonda Jackson's husband's, William Jackson's, Motion to Substitute. (Docs. 36, 37). Thus, William Jackson is now the Plaintiff in this case.

[2]     The relevant facts are derived from the Parties' Statements of Material facts, responses thereto, and the record in this case. (*See* Docs. 19-1, 24-1, 24-2). When evaluating the Motion for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342 (11th Cir. 2016) (citations omitted).

complaints that she was following co-workers around the office and spraying them with Lysol. (Doc. 19-1 ¶ 5). The relevant portion of the Policy states:

> Unlawful harassment is prohibited by this Policy and consists of verbal or physical conduct that is abusive toward an individual. Such prohibited harassment may occur because of that individual's race, color, sex, age, religion, national origin, disability, veteran's status or other prohibited reason that has the purpose or effect of (1) creating an intimidating, hostile or offensive working environment, (2) unreasonably interfering with an individual's work performance, or (3) otherwise adversely affecting an individual's employment opportunities.

(Doc. 19-4 at 45; Doc. 24-1 ¶ 6; Doc. 24-2 ¶ 45).

Jackson's desk was at the entrance of the Board's office suite (Board Suite) as one of Jackson's primary job duties was to greet visitors and staff as they entered the Board Suite. (Doc. 19-1 ¶¶ 1,12; Doc. 24-1 ¶¶ 1, 12). On March 11, 2022, Nancy Jimenez, a clerk for the juvenile court, emailed a complaint to Deatrice Harris, Defendant's Director of Human Resources. (Doc. 19-1 ¶¶ 16–18; Doc. 24-1 ¶¶ 16–18; Doc. 19-8 at 5–6). In the email, Jimenez asserted Jackson was harassing Jimenez and her co-worker, Angela Williams, who would go to the Board Suite every day to check the mail, to pick up stamps, and to use the postage machine. (*See* Doc. 19-8). Jimenez explained that for the past two months, "[e]very time that either [Jimenez or Williams] enter the [Board S]uite, . . . Jackson gets up and walks directly behind [them] as she sprays behind [their] every step with Lysol." (Doc. 19-8 at 6). Further, Jimenez wrote:

> This week, [Williams] was wearing a dress and [Jackson] followed her to the postal machine and sprayed Lysol inches from her body. [Williams] had Lysol sprayed all over the back of her dress and her legs. This afternoon, I entered the [Board Suite] to get stamps from the postal machine and [Jackson] sprayed Lysol directly behind me with each step that I took to the postal machine. She sprayed the Lysol so close to me that it got in my mouth. We have noticed that she does not get up and spray Lysol directly behind every person that enters the [Board Suite]. There have been several other people entering the office, without a mask, that she did not get up and spray Lysol behind as they entered. Even if we wear masks into the

[Board Suite], she still gets up as soon as we walk in and follows behind us spraying.

It has gotten to the point where neither of us feel comfortable going to the [Board Suite] to do our daily tasks such as check the Juvenile Court cubby or get stamps. It is also extremely offensive. This is something that has been going on for about two months and has happened many, many times, with or without a mask on.

(*Id.*).

As part of Harris' investigation into Jimenez's complaint, she met with Jimenez and Williams separately on March 14, 2022. (Doc. 19-1 ¶ 26; Doc. 24-1 ¶ 26). According to Harris, Williams confirmed that Jackson had followed her around spraying Lysol when she came into the Board Suite and that, on one occasion, Jackson had sprayed the Lysol so close to her that her dress and legs got wet from the spray. (Doc. 19-1 ¶ 27; Doc. 24-1 ¶ 27; *see also* Doc. 19-9). During the interview, Jimenez informed Harris that Latoya McCants had witnessed Jackson's behavior, and Harris interviewed her as well. (Doc. 19-1 ¶¶ 28–29; Doc. 24-1 ¶¶ 28–29). McCants provided a signed written statement to Harris, stating that "[n]ormally whenever the ladies from juvenile court enter[] the [Board Suite, Jackson] is going to get up and spray the Lysol in the area the ladies have been in inside of the suite." (Doc. 19-10; Doc. 19-1 ¶ 30; Doc. 24-1 ¶ 30). She stated specifically that on March 10, 2022, when "one of the ladies from juvenile court entered the BOC suite to use the postage machine, . . . Jackson got up and walked behind her spraying the Lysol directly in the area she was in." (Doc. 19-10; Doc. 19-1 ¶ 30; Doc. 24-1 ¶ 30).

Jimenez emailed Harris about her complaint again on March 14, 2022. (Doc. 19-1 ¶ 31; Doc. 24-1 ¶ 31; Doc. 19-23 at 1). Jimenez informed Harris that on March 11, as she was entering the Board Suite, another employee walked ahead of her into the Board Suite. (Doc. 19-1 ¶¶ 32–33; Doc. 24-1 ¶¶ 32–33; Doc. 19-23 at 1). Jackson did not get up or follow the employee who entered before Jimenez; but once Jimenez entered, Jackson began to follow spraying Lysol behind her and "all over mailboxes that [she had not] even touched." (Doc. 19-23 at 1; Doc. 19-1 ¶ 32; Doc. 24-1 ¶ 32).

Williams emailed Harris on March 21, 2022, to further detail her complaint against Jackson. (Doc. 19-1 ¶ 34; Doc. 24-1 ¶ 34; Doc. 19-29). Williams wrote in the email that Jackson had followed her spraying Lysol approximately twenty times over the past few months at times when she was wearing and not wearing a mask. (Doc. 19-1 ¶ 35; Doc. 24-1 ¶ 35; Doc. 19-29). She also wrote that she observed a male employee walk through the Board Suite without being sprayed with Lysol by Jackson and concluded from this that "[i]t seems like [Jackson] picks and chooses who she sprays [L]ysol behind." (Doc. 19-1 ¶ 35; Doc. 24-1 ¶ 35; Doc. 19-29). Like Jimenez, she explains that she did "not feel comfortable entering the [Board Suite] to complete daily tasks for [the court] due to . . . Jackson's behavior." (Doc. 19-29; Doc. 19-1 ¶ 35; Doc. 24-1 ¶ 35).

Jackson was on FMLA leave from March 15, 2022, to March 27, 2022. (Doc. 24-2 ¶ 31; Doc. 19-1 ¶ 37; Doc. 24-1 ¶ 37). Upon her return on March 28, 2022, Harris met with Jackson to discuss the complaint. (Doc. 19-1 ¶¶ 37–38; Doc. 24-1 ¶¶ 37–38). During the meeting, Jackson did not deny the allegations that she had sprayed Jimenez and Williams with Lysol; but she told Harris that Jimenez and Williams did not like her because of past issues related to a former co-worker. (Doc. 19-1 ¶ 40; Doc. 24-1 ¶ 40; Doc. 19-43 at 84:25–85:18). Harris told Jackson to submit a written response to the allegations, and Jackson did so on March 31, 2022. (Doc. 19-1 ¶ 41; Doc. 24-1 ¶ 41). In the response, Jackson denied harassing Jimenez and Williams and explained that she sprayed the Lysol as a safety precaution due to her underlying health issues. (Doc. 19-32 at 1). Jackson stated that she never sprayed Jimenez and Williams directly and that she sprayed the Board Suite "when anyone has entered without a mask while they have been in the office[.]" (*Id.*).

On April 12, 2022, Harris wrote a letter to Jackson summarizing her findings. (Doc. 19-1 ¶ 45; Doc. 24-1 ¶ 45; Doc. 19-33). She found: (1) Jackson "sprays disinfectant upon the two (2) individuals' entrance into the suite[,]" (2) Jackson "sprays near the mailboxes and postal machine area while the occupants are still in the space[,]" and (3) Jackson "does not always spray upon the entrance of other individuals' entrance into the" Board Suite. (Doc. 19-33 at 2; Doc. 19-1 ¶ 47; Doc. 24-1 ¶ 47). Harris concluded that this conduct violated Defendant's harassment policy. (Doc. 19-33 at 1; Doc. 19-1 ¶ 46; Doc. 24-1 ¶ 46).

Harris further found that "there [was] no medical documentation on file that supports [Jackson's] justification for spraying the disinfectant when individuals enter the" Board Suite. (Doc. 19-33 at 1; Doc. 19-1 ¶ 46; Doc. 24-1 ¶ 46). Harris recommended that Jackson receive a written reprimand and wrote: Jackson's "role is integral to the [Board Suite] and the behavior and actions displayed were unprofessional and offensive. The behavior depicted is harassment and causes an offensive and hostile environment. This behavior must cease immediately." (Doc. 19-33 at 1; Doc. 19-1 ¶ 47; Doc. 24-1 ¶ 47).

Harris contemporaneously informed Volley, Jackson's direct supervisor, of the complaints and the HR investigation and provided Volley with the April 12, 2022 letter containing Harris' recommendation and all materials relating to the investigation. (Doc. 19-1 ¶¶ 48–50; Doc. 24-1 ¶¶ 48–50). Volley, not Harris, had the authority to make the final determination regarding any disciplinary actions. (Doc. 19-1 ¶¶ 24, 51; Doc. 24-1 ¶¶ 24, 51). A few days after Volley received the materials from Harris, Volley, Harris, and Jackson met to discuss the complaint. (Doc. 19-1 ¶ 52; *see* Doc. 19-43 at 91:18–92:22). At the meeting, Jackson told Harris and Volley that she only sprayed the disinfectant when people entered the Board Suite without wearing a mask due to her underlying health conditions, including COPD and chronic kidney disease. (Doc. 19-1 ¶ 53; Doc. 19-43 at 92:4–22). Jackson was informed that Harris had recommended she receive a written reprimand and that Volley would consider that recommendation and the findings of the investigation to determine if and how Jackson should be disciplined. (Doc. 19-1 ¶ 58; Doc. 19-43 at 92:4–12). Volley also requested that Jackson provide her with documentation regarding her health conditions and asked if Jackson required any accommodations. (Doc. 19-1 ¶¶ 59, 61; Doc. 24-1 ¶¶ 59, 61).

Jackson told Volley that there was a chair near her desk that visitors would sit in without a mask and requested that the chair be moved. (Doc. 19-1 ¶ 62; Doc. 24-1 ¶ 62). Soon after, the chair was moved pursuant to Jackson's request. (Doc. 19-1 ¶ 62; Doc. 24-1 ¶ 62; Doc. 19-43 at 90:4–14). On April 19, 2022, Jackson provided a letter from Dr. Joseph Stephen McClendon of Albany Internal Medicine stating that he had been treating Jackson for COPD and explaining that, due to her COPD and other health problems,

Jackson "need[ed] to take extra precautions outside of her home to protect herself against COVID and other respiratory infections." (Doc. 19-12). On April 20, 2022, Jackson provided a doctor's note from Dr. Tamorie Smith of Renal Associates, LLC stating that the doctor had been treating Jackson for Chronic Kidney Disease stage 4 and explaining that she had advised Jackson "to avoid any interaction with any person with known [COVID]or suspected [COVID]." (Doc. 19-13).

On April 22, 2022, Jackson lodged a grievance to the Board regarding Harris' investigation and recommendation. (Doc. 19-1 ¶ 70; Doc. 24-1 ¶ 70; *see* Doc. 19-34). Therein, she described the investigation into the complaints against her and explained that she sprayed the Lysol as a safety precaution given her "several underlined medical health issues[.]" (Doc. 19-34 at 2). Jackson wrote that she was "not satisfied with the outcome" of the investigation because "it [was] apparent [she] was not effectively communicated to" regarding the investigation. (*Id.* at 3). She also expressed concern that Harris had not spoken to all the relevant witnesses during the investigation. (*Id.*; Doc. 19-1 ¶ 70; Doc. 24-1 ¶ 70). The same day, Volley emailed Jackson to inform her that, pursuant to Defendant's grievance policy, Volley, Harris, and Jackson had to meet to discuss the grievance before it could go to the Board. (Doc. 19-35 at 1; Doc. 19-1 ¶¶ 72–74; Doc. 24-1 ¶¶ 72–74). On April 25, 2022, Volley, Harris, and Jackson met to discuss Jackson's grievance. (Doc. 19-1 ¶ 74; Doc. 24-1 ¶ 74). Jackson explained that she was attempting to appeal Harris' April 12 letter recommending discipline when she filed the grievance with the Board. (Doc. 19-1 ¶¶ 75–76; Doc. 24-1 ¶¶ 75–76). Volley explained that Harris' letter was merely a recommendation and that Volley would make a final determination regarding any discipline. (Doc. 19-1 ¶ 76; Doc. 24-1 ¶ 76).

Harris drafted a memorandum to Volley reiterating her findings pursuant to the investigation and her recommendation that Jackson receive a written reprimand for her conduct. (Doc. 19-1 ¶ 77; Doc. 24-1 ¶ 77). Volley reviewed all materials provided by Harris, including the emails from Jimenez and Williams regarding Jackson's conduct, the statement from McCants, Jackson's written response to the allegations, and Defendant's policies and procedures. (Doc. 19-1 ¶ 78; Doc. 24-1 ¶ 78). Upon review of these materials,

Volley determined that Jimenez and Williams' accounts were more credible than Jackson's and that "[Jackson's] justification for spraying Lysol did not warrant the conduct she displayed." (Doc. 19-3 ¶ 45). She, thus, concluded that Jackson's conduct "amounted to harassment in violation of the [h]arassment [p]olicy and created a hostile work environment for Jimenez and Williams." (*Id.* ¶ 47). Volley averred that she reached this conclusion "because it appeared that [Jackson's] conduct was intimidating Jimenez and Williams and interfering with the ability of Jimenez and Williams to perform their jobs and complete their daily tasks in a comfortable and professional setting." (*Id.* ¶ 48). Volley stated that she found Jackson's behavior "to be further unacceptable because, as the administrative assistant for the Board, [Jackson] was the public face of [Defendant] and the Board to visitors and staff when they entered the [Board Suite, and it] was unacceptable for [Jackson] to be behaving in such an unprofessional manner in this way." (*Id.* ¶ 49). This conduct "made [Volley] believe that [Jackson] could not carry out her job as administrative assistant in a professional and courteous manner towards staff members and the public." (*Id.* ¶ 53). Thus, Volley determined that Jackson's conduct warranted dismissal. (*Id.* ¶ 52).

On April 26, 2022, Volley emailed Harris to inform her of the decision to terminate Jackson's employment. (Doc. 19-1 ¶ 86; Doc. 24-1 ¶ 86). Volley and Harris met with Jackson in person to inform her of the termination. (Doc. 19-1 ¶ 89; Doc. 24-1 ¶ 89). At the meeting, after Jackson was informed that she was being dismissed, she provided Volley and Harris with a resignation letter. (Doc. 19-1 ¶ 90; Doc. 24-1 ¶ 90). Jackson was told that the resignation letter would not be accepted and that she was dismissed, effective that day. (Doc. 19-1 ¶ 91; Doc. 24-1 ¶ 91).

Jackson filed a charge of discrimination with the Equal Employment Opportunity Commission on September 2, 2022. (Doc. 19-1 ¶ 95; Doc. 24-1 ¶ 95). In the charge, she alleges that she had been "discriminated against because of [her] disability and subjected to retaliatory discharge in violation of Title I of the Americans with Disabilities Act[.]" (Doc. 19-1 ¶ 95 (alteration in original); Doc. 24-1 ¶ 95). Jackson received her Notice of Right to Sue from the EEOC on September 15, 2022. (Doc. 19-1 ¶ 96; Doc. 24-1 ¶ 96). Jackson initiated this action on December 8, 2022, and filed an Amended Complaint on

February 13, 2023. (Docs. 1, 9). In the Amended Complaint, Jackson brings claims for disability discrimination under Title I of the Americans with Disabilities Act (ADA), as amended, 42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* and for retaliation under 42 U.S.C. § 1981, Title VII, the ADA, and the Rehabilitation Act.[3] (Doc. 9 ¶¶ 16–31). On January 2, 2024, Defendant filed the Motion for Summary Judgment. (Doc. 19). Jackson responded on February 13, 2024, and Defendant replied on March 26, 2024. (Docs. 24, 29). On June 5, 2024, Jackson passed away. (Doc. 33). Her husband, Plaintiff William Jackson, filed a Motion to Substitute on June 20, 2024. (Doc. 34). After Plaintiff re-filed the Motion making an appropriate showing under Rule 25 that he was a proper party, the Court granted the Renewed Motion to Substitute. (Docs. 35, 36, 37). The Motion for Summary Judgment is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N.*

---

[3]     The introductory paragraph of the Complaint states that the discrimination claim is brought under the ADA and the Rehabilitation Act, but the paragraphs in Count I state that the discrimination claim is brought under the Rehabilitation Act. (Doc. 9 ¶¶ 1, 16–23). In the Response, Plaintiff discusses the discrimination claim referencing both statutes. (Doc. 24-3 at 4–11). In an abundance of caution, the Court considers Plaintiff's discrimination claims under both statutes.

*Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the non-moving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam) (citation omitted). If the movant meets their initial burden, the non-moving party must demonstrate that there is a genuine dispute for trial. *Whitehead*, 979 F.3d at 1328 (citing *Celotex Corp.*, 447 U.S. at 324). "The nonmovant is required to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex*, 477 U.S. at 324).

## DISCUSSION

Defendant moves for summary judgment on Plaintiff's claim for discrimination under the ADA and Rehabilitation Act and for retaliation under 42 U.S.C. § 1981, Title VII, the ADA, and the Rehabilitation Act. (Doc. 9 ¶¶ 16–31).

### I.    Disability Discrimination

The ADA prohibits employers from discriminating against a qualified individual on the basis of a disability. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir. 2021) (citing 42 U.S.C. § 12112(a)). The ADA imposes a "'but-for' causation standard—that is, an adverse employment action would not have occurred but for the plaintiff's

disability." *Akridge v. Alfa Ins.*, 93 F.4th 1181, 1192 (11th Cir. 2024) (citations omitted). Thus, a plaintiff must establish that she would not have suffered the adverse action but for her disability. *See id.* The Rehabilitation Act similarly prohibits federally funded programs from discriminating on the basis of a disability. *See Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999) (citing 29 U.S.C. § 791). Courts analyze "claims brought under the ADA and Rehabilitation Act using the same legal framework." *Todd*, 998 F.3d at 1214 (citing *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 n.2 (11th Cir. 1997)). Thus, a plaintiff alleging a violation of the Rehabilitation likewise must establish that she would not have suffered the adverse action but for her disability. *See Akridge*, 93 F.4th at 1192–93.

To survive the Defendant's Motion for Summary Judgment, Plaintiff must offer "either direct or circumstantial evidence" that "would allow a reasonable jury to find that [Defendant] terminated [Jackson's] employment and thus discriminated against her because of her disability." *Todd*, 998 F.3d at 1214–15 (citation omitted). In the absence of direct evidence of discrimination, Plaintiff may establish a prima facie case of an ADA or Rehabilitation Act violation by showing that Jackson: (1) had a disability, (2) was otherwise qualified for the position, and (3) was discriminated against on the basis of her disability. *Akridge*, 93 F.4th at 1194 (citing *Beasley v. O'Reilly Auto Parts*, 69 F. 4th 744, 754 (11th Cir. 2023)). A plaintiff can demonstrate that she was discriminated against on the basis of a disability by presenting circumstantial evidence that she "was treated less favorably than a similarly situated, non-disabled person." *Id.* (quoting *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1275 (11th Cir. 2022)) (other citations omitted). If a plaintiff establishes a prima facie case, the burden shifts to the employer to "rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Liebman v. Metro. Life Ins.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (citation omitted). "If the employer proffers a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the employer's reason is a pretext." *Id.*; *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

Defendant does not contest that Plaintiff has satisfied the first and second prongs of a *prima facie* case but argues that Plaintiff cannot show that Jackson was discriminated against because of her disability. (Doc. 19-2 at 13). First, Defendant argues that Plaintiff cannot meet this element because he failed to show that a similarly situated comparator outside of Jackson's protected class was treated differently from her. (*Id.* at 14). Second, Defendant argues that Harris did not know about Jackson's disability until after she initiated the investigation and Volley did not know about Jackson's disability until April 2022; therefore, Plaintiff cannot show that Harris initiated the investigation or that Volley determined that dismissal was the appropriate discipline because of Jackson's disability. (*Id.* at 13–14). Finally, Defendant argues that it had a legitimate non-discriminatory reason for Jackson's dismissal—her violation of the harassment policy. (*Id.*).

In response, Plaintiff argues that comparator evidence is not required in ADA or Rehabilitation Act cases. (Doc. 24-3 at 7). Plaintiff does not argue that he has established a prima facie case of discrimination. (*See id.*). Rather, he argues that he has established that Jackson's disability was the but-for cause of her dismissal using a convincing mosaic of "non-comparison circumstantial evidence." (*Id.*). Specifically, Plaintiff argues that he has created a convincing mosaic of evidence because the decisionmakers learned about Jackson's specific disability fourteen days before terminating her employment, they had discussions about possible accommodations, and she was terminated because of her efforts to protect herself against COVID because of her disabilities. (*Id.* at 12).

A "plaintiff will always survive summary judgment if []he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Akridge*, 93 F.4th at 1197 (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)). "[T]he inference to be drawn by a jury must be that the employee's disability was a but-for cause of the employer's intentional discrimination." *Id.* (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332–33 (2020)) (other citation omitted). "A plaintiff's mosaic may be made up of, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) systemically better

treatment of similarly situated employees; and (3) evidence that the employer's justification is pretextual." *Id.* at 1198 (internal quotation marks omitted) (quoting *Lewis*, 934 F.3d at 1185).

Here, there is no suspicious timing that would support a claim of discrimination. Considering the totality of the circumstances, the timing of Jackson's termination "is anything but suspicious." *Id.* Jimenez and Williams made complaints of harassment against Jackson in mid-March 2022, Harris in HR investigated the complaints over the course of the next month, and Harris submitted her report and recommended discipline to Volley on April 12, 2022. (*See* Doc. 19-1 ¶¶ 18–86; Doc. 24-1 ¶¶ 18–86). All of this occurred before Jackson disclosed her COPD and chronic kidney disease. (Doc. 19-1 ¶¶ 18–86; Doc. 24-1 ¶¶ 18–86). While the ultimate decision was made after Jackson disclosed her disability, the close proximity between these two events is "not sufficient [for a jury] to infer that [Jackson] was terminated" on the basis of her disability given that her termination "was also in close proximity" to the alleged misconduct and investigation that were the "incidents for which [Defendant] assert[s] [Jackson] was terminated." *Hayes v. ATL Hawks, LLC*, 844 F. App'x 171, 180 (11th Cir. 2021) (per curiam); *Key v. Cent. Ga. Kidney Specialists PC*, No. 20-14351, 2021 WL 5321892, at *4 (11th Cir. 2021) (per curiam) (explaining that "[w]hen viewed in the light of the record as a whole—including Plaintiff's unprofessional conduct on the days immediately preceding Plaintiff's firing—Plaintiff's evidence of 'suspicious' timing [wa]s insufficient" to create a convincing mosaic). To the extent that Plaintiff argues that Volley and Harris learned of Jackson's disability at an earlier point in time, he has still failed to show suspicious timing. (*See* Doc. 24-3 at 7–8). Jackson disclosed to Volley that she had "medical issues" more broadly when Volley took over as Jackson's supervisor in January of 2022, but the alleged misconduct occurred in March of 2022 breaking any causal connection between the disclosure and Jackson's termination. (Doc. 24-3 at 7; Doc. 24-2 ¶ 18); *see Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011) (per curiam) (explaining that intervening misconduct breaks any causal connection established based on temporal proximity). As to Harris, Jackson alleges that Harris filled out FMLA paperwork and stated therein that she learned

on March 18, 2022 that Jackson needed leave due to a "serious health condition." (Doc. 23-5 at 3). But, again, considering the record as a whole and the ongoing investigation into Jackson's misconduct, which was close in time to any disclosure, Jackson has not shown suspicious timing. *See Hayes*, 844 F. App'x at 180; *Key*, 2021 WL 5321892, at *4.

Nor is there systematically better treatment of similarly situated employees. *See Akridge*, 93 F.4th at 1198. Plaintiff states that "[e]veryone" was spraying Lysol and that Jackson was the only one to be punished as a result, but this is not sufficient to establish that similarly situated employees received systematically better treatment. (*See* Doc. 24-3 at 12). Moreover, there is no evidence in the record that any other employee acted in the aggressive manner that Jackson did by following other employees and spraying Lysol on their clothing and person or that Defendant received complaints of similar behavior by other employees. (Doc. 23-1 at 50:13–15)

Likewise, there is not evidence that the reason for Jackson's firing was pretextual. *See Akridge*, 93 F.4th at 1198. The Eleventh Circuit has "made clear that an 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for . . . discriminatory reason[s]." *Akridge*, 93 F.4th at 1195 (quoting *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022)). When considering an employer's proffered reasons for termination, the Court does not "sit as a super-personnel department that reexamines an entity's business decisions," and may not "analyze whether an employer's proffered reasons are prudent or fair." *Id.* (quoting *Owens*, 52 F.4th at 1338). "A reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Akridge*, 943 F.4th at 1196 (quoting *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021)). Furthermore, "[t]he pretext inquiry centers on the employer's belief, not the employee's beliefs and to be blunt about it, not on reality as it exists outside the decision maker's head." *Id.* (quoting *Todd*, 998 F.3d at 1218).

Plaintiff argues that the reason for termination is pretextual because "[e]veryone" was spraying Lysol at the time of Jackon's termination and presents deposition testimony from Volley, Jackson's supervisor, that employees were spraying Lysol during the

pandemic. (Doc. 24-3 at 12; Doc. 23-1 at 49:12–23). Plaintiff also argues that it is "questionable" that Jackson violated the harassment policy because there was no allegation that Jackson's conduct "was based on someone else's race, color, sex, age, religion, national origin, disability, veteran's status or any other prohibited reason" and that Volley's decision to terminate Jackson's employment when Harris only recommended a written reprimand also demonstrates pretext. (Doc. 24-3 at 11, 12, 18).

As noted above there were no "other complaints of anyone else spraying Lysol behind, after, on, et cetera of other people." (Doc. 23-1 at 50:13–15). Moreover, Volley believed Jackson created a hostile work environment "because . . . Jackson got up out of her seat, out of her personal space, and followed behind [Jimenez and Willims], spraying the Lysol" and made them "uncomfortable coming [to the Board Suite] to perform their [job] duties." (*Id.* at 51:13–52:17). Plaintiff argues that, because the harassment policy explicitly applies to harassment based on a protected characteristic and because there was no allegation that Jackson harassed Jimenez or Williams based on these characteristics, the stated reason for Jackson's firing—violation of the policy—is pretext. (Doc. 24-3 at 11–12). Plaintiff's proffered reading of the harassment policy is narrow and excludes a broad catchall phrase that can reasonably be read to prohibit Jackson's behavior. (*See id.* at 12). The policy prohibits abusive behavior directed at an individual. (*See id.*; Doc. 19-4 at 45). While the policy explicitly states that such behavior on the basis of the "individual's race, color, sex, age, religion, national origin, disability, [or] veteran's status" is prohibited, it also includes the broader language disallowing abusive conduct for "other prohibited reason[s] [having] the purpose or effect of (1) creating an intimidating, hostile or offensive working environment, (2) unreasonably interfering with an individual's work performance, or (3) otherwise adversely affecting an individual's employment opportunities." (Doc. 19-4 at 45). According to Volley,

> [her] understanding now, and at all times relevant to this Lawsuit, is that, according to the Harassment Policy, any conduct that has the effect of "creating an intimidating, hostile or offensive working environment"; "unreasonably interfering with an individual's work performance"; or "otherwise

> adversely affecting an individual's employment opportunities"
> can amount to harassment, regardless of whether that conduct
> is done "because of [an] individual's race, color, sex, religion,
> national origin, disability, veteran's status or other prohibited
> reason."

(Doc. 19-3 ¶ 38 (second alteration in original)). Volley's understanding of the policy is arguably correct; but even if it were not, "[a] reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Akridge*, 943 F.4th 1181, 1196 (quoting *Ring*, 4 F.4th at 1163). Volley averred that she believed that Jackson's behavior "created a hostile work environment for Jimenez and Williams[] because it appeared that [Jackson's] conduct was intimidating Jimenez and Williams and interfering with the ability of Jimenez and Williams to perform their jobs and complete their daily tasks in a comfortable and professional setting." (Doc. 19-3 ¶ 48). "In addition, [Volley] found [Jackson's] behavior to be further unacceptable because, as the administrative assistant for the Board, [Jackson] was the public face of Sumter County and the Board to visitors and staff when they entered the [Board] Suite[,]" and that "[i]t was unacceptable for [Jackson] to be behaving in such an unprofessional manner in this way." (*Id.* ¶ 49). There is no evidence in the record which even suggests that Volley did not honestly believe that Jackson had violated the policy, created a hostile work environment for other employees, or otherwise behaved inappropriately. Likewise, the fact that Volley determined that a more severe disciplinary action was appropriate is not by itself—or viewed in combination with the other circumstances—evidence of pretext. Plaintiff only presents the Court with conjecture and speculation that Volley had an ulterior motive when she decided to terminate Jackson's employment. "Such '[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Akridge*, 93 F.4th at 1196–97 (alteration in original) (quoting *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).

Plaintiff has not established a prima facie case nor set forth a convincing mosaic "that would allow a jury to infer intentional [disability] discrimination." *Id.* at 1198

(quoting *Lewis*, 934 F.3d at 1185). Accordingly, summary judgment is appropriate as to Plaintiff's disability discrimination claim.

## II.    Retaliation

The header for Count II reads: "Retaliation Pursuant to 42 U.SC. § 1981 & Title VII[.]" (Doc. 9 at 6). In his Response, however, Plaintiff frames the retaliation claim as one under the ADA, stating that "[w]hile the heading four Count [II] lists retaliation pursuant to 42 U.S.C. §[ ]1981 and Title VII, the actual allegations in the body of the Amended Complaint make it clear that the protected activity and resulting retaliatory actions are related to [Jackson's] complaints of disability discrimination under the ADA and Rehabilitation Act similar to the rest of [the] complaint." (Doc. 24-3 at 13 n.2). Defendant argues that summary judgment is appropriate (1) as to Plaintiff's retaliation claim under § 1981, because a retaliation claim under §1981 cannot be brought against a state actor; and (2) as to the retaliation claim under Title VII, because Plaintiff failed to exhaust the administrative remedies. (Doc 19-2 at 15–17). Because Plaintiff does not challenge Defendant's arguments regarding any possible retaliation claim pursuant to § 1981 or Title VII, Plaintiff is deemed to have abandoned any such claims. *See Jones v. Bank of Am., N.A.*, 564 F. App'x 432, 434 (11th Cir. 2014) (per curiam) ("[W]hen a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." (citation omitted)).

The ADA's antiretaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge testified, assisted, or participated in an investigation, proceeding, or, or hearing under this chapter." 42 U.S.C. § 12203(a). Courts "assess ADA retaliation claims under the same framework [that they] employ for retaliation claims under Title VII." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997) (citation omitted); *see also Ring*, 4 F.4th at 1162–63 (applying the burden-shifting framework set forth set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03 (1973)). "[T]o avoid summary judgment, a plaintiff must establish a prima facie case of retaliation." *Ring*, 4 F.4th at 1163 (citation

omitted). To establish a prima facie case of retaliation under the ADA, "a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action; and (3) the adverse action was causally related to the protected expression." *Id.* (quoting *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004)). "After a plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate legitimate nondiscriminatory reasons for the adverse action." *Id.* (citing *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1332, 1336 (11th Cir. 1999)).

There is no question that Jackson suffered an adverse employment action when she was fired; and given the timing between the alleged protected activity and her firing, Plaintiff would be able to establish causation if he establishes that Jackson did in fact engage in statutorily protected activity. (*See* Doc. 19-1 ¶¶ 53–86; Doc. 24-1 ¶¶ 53–86). Defendant argues, however, that Plaintiff cannot establish that Jackson engaged in protected expression. (Doc. 29 at 4–5). Plaintiff argues that Jackson engaged in protected activity when she brought up having an underlying "medical health issue" in her written response to the allegations against her, when she told Volley and Harris about her COPD and chronic kidney disease in the April 2022 meeting with Volley and Harris about the investigation, when she asked for the chair by her desk to be moved as an accommodation during the same April 2022 meeting with Volley and Harris, and when she filed a grievance regarding the investigation. (Doc. 24-3 at 13–15). Defendant notes, however, that the only protected activity alleged in the Amended Complaint is the filing of the grievance and that Plaintiff cannot now amend the Complaint in the Response to the Motion for Summary Judgment. (Doc. 29 at 4–5).

In Count II of the Amended Complaint, Plaintiff alleges that Jackson "engaged in protected activity by filing a grievance due to the accusations of her co-workers and treatment by Defendant because of her disabilities." (Doc. 9 ¶ 25). Count II contains no other allegations regarding protected activity. (*See id.* ¶¶ 24–31). The Eleventh Circuit addressed a similar issue in *Lightfoot v. Henry County School District*, 771 F.3d 764, 778–79 (11th Cir. 2014). In *Lightfoot*, the plaintiff alleged in her ADA retaliation count that she was retaliated against after reporting that she was being disciplined more harshly because

of her disability and in her FMLA retaliation count that she was retaliated against for exercising her FMLA rights by taking medical leave. *Id.* at 778. After the district court granted summary judgment because the plaintiff presented no evidence that she had been disciplined by her employer, the plaintiff argued on appeal that the district court should have construed the allegation regarding her request for FMLA leave in her FMLA count as a factual basis for her ADA retaliation count. *Id.* at 779. The Court of Appeals disagreed, explaining that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Id.* (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam)). As the district court in *Lightfoot* did, the Court declines "to construe [Plaintiff's] ADA retaliation claim as being based on different facts than the ones actually pled in [the] ADA count." *Id.* "The general allegations that appear elsewhere in the complaint merely supported [Plaintiff's ADA and Rehabilitation Act discrimination claims in Count I], and did not put [Defendant] on notice that they also pertained to [the] ADA retaliation count." *Id.* Thus, the Court does not consider Plaintiff's newly asserted protected expression. *See id.*

An employee engages in protected expression when she opposes a practice the ADA makes unlawful or when she makes a request for a reasonable accommodation. 42 U.S.C. § 12203(a); *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir. 2016) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). To establish this element, "it is sufficient that an employee have a good faith, objectively reasonable belief that h[er] activity is protected by the" ADA. *Standard*, 161 F.3d at 1328 (citations omitted). Furthermore, both informal complaints and internal grievances can be statutorily protected expression. *See Rollins v. Fla. Dep't of L. Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam).

Defendant argues that Jackson did not engage in protected expression when she filed the grievance because she did not assert that Defendant had engaged in unlawful activity under the ADA in the course of the HR investigation. (Doc. 19-2 at 17–19). "A complaint about an employment practice constitutes protected opposition only if the individual

explicitly or implicitly communicates a belief that the [employment] practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (per curiam) (internal quotation marks and citation omitted). Jackson did not oppose a practice that is unlawful under the ADA. (*See* Doc. 19-34). In the grievance, Jackson challenged the investigation. (Doc. 19-34 at 3). Specifically, Jackson stated that "it [was] apparent [she] was not effectively communicated to" and that Harris has not spoken to all relevant witnesses. (*See id.*). This does not constitute a complaint that Harris engaged in a practice made unlawful under the ADA. (*See id.*); *see Gary v. City of Warner Robins*, No. 5:16-CV-151 (TES), 2018 WL 3825220, at *12 (M.D. Ga. Aug. 10, 2018) ("Plaintiff did not engage in statutorily protected activity when she filed her formal grievance . . . because her allegations did not put [the defendant] on notice she was opposing any unlawful conduct under . . . the ADA."); *see also Francisco v. Pinellas County*, 2024 WL 4853978, at * 4 (M.D. Fla. Nov. 21, 2024) ("Though [plaintiff] described having anxiety in [the internal grievance], those symptoms are couched as a consequence of her work situation, as opposed to the reason for the discrimination." (citation omitted)). Although Jackson mentions her health conditions to explain that she "was not attempting to harass anyone [but was] just practicing safety precautions[,]" she never states, or even suggests, that the investigation or Harris' recommendation was motivated by her disability. (*See* Doc. 19-34). Thus, she did not engage in protected activity when she filed the grievance.

As to the causation element, Plaintiff need only "prove that the protected activity and the . . . [adverse] action are not completely unrelated." *Higdon*, 393 F.3d at 1220 (alteration and omission in original) (quoting *Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998); *Oirya v. Mando Am. Corp.*, No. 23-11429, 2024 WL 1462500, at *7 (11th Cir. Apr. 4, 2024) (per curiam). "'A plaintiff satisfies this element if []he provides sufficient evidence' of knowledge of the protected expression and 'that there was a close temporal proximity between this awareness and the adverse . . . action." *Higdon*, 393 F.3d at 1220 (omission in original) (quoting *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 n.3 (11th Cir. 2003)). The Eleventh Circuit has held "that a period as much as one month

between the protected expression and the adverse action is not too protracted." *Id.* (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998)); *Oirya*, 2024 WL 1462500, at *7. Here, the Parties do not dispute that Defendant was aware that Jackson made the April 22, 2022 grievance and that Defendant terminated Jackson four days after the grievance was made. (Doc. 19-35 at 1; Doc. 19-1 ¶¶ 5, 70, 89; Doc. 24-1 ¶¶ 5, 70, 89). Thus, given the close temporal proximity, the causation element would have been met had Plaintiff properly pled that Jackson engaged in a protected activity when she filed the grievance.

Even if Plaintiff had established a prima facie case of retaliation, Defendant had a legitimate non-discriminatory reason for terminating Jackson—her harassment of other employees. (*See* Doc. 19-3 ¶¶ 48–49). Therefore, the burden shifts to Plaintiff to establish that the proffered reason is pretext for discrimination. *See Ring*, 4 F.4th at 1163. Plaintiff claims that Volley's decision to terminate Jackson instead of issuing a written reprimand—as HR suggested—so close in time to Jackson's accommodation request demonstrates pretext. (Doc. 24-3 at 15–19). Considering, however, that the investigation into complaints against Jackson preceded and continued after Jackson allegedly engaged in the protected activity, Plaintiff has not shown pretext. *See Stewart*, 117 F.3d at 1287 (finding meritless plaintiff's claim that timing of discharge related to her request for accommodations because "[i]t is undisputed that the numerous acts of alleged insubordination in this case occurred around the same time period as [the plaintiff's] request for accommodations"); *Belgrave v. Public Super Market, Inc.*, No. 22-13021, 2023 WL 3477790, at *4 (11th Cir. May 16, 2023) (per curiam) ("Even if [defendant] fired [plaintiff] shortly after his last head injury, it identified legitimate, non-retaliatory reasons for doing so . . . ."). Jackson harassed other employees by selectively following them and spraying disinfectant on them, and her supervisor determined that Jackson's harassment and unprofessional behavior—in light of her public facing position—warranted dismissal. (*See* Doc. 19-1 ¶¶ 18–93; Doc. 24-1 ¶¶ 18–93; Doc. 19-3). While Plaintiff speculates that Volley had an ulterior motive for deciding to terminate Jackson, such speculation—without support—does not create a genuine dispute of material fact for purposes of summary judgment. (Doc. 24-3 at 15–19);

*see Akridge*, 93 F.4th at 1196–97 (quoting *Cordoba*, 419 F.3d at 1181). Accordingly, Defendant is entitled to summary judgment as to Plaintiff's retaliation claim.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 19) is **GRANTED**.

**SO ORDERED**, this 31st day of March, 2025.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**